**Slip Op. 05-118**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
SIMON MARKETING, INC. and            :
PERSECO SYSTEM SERVICES, L.P.,        :
                                     :
         Plaintiffs,                 :
                                     :   Court No. 00-00332
         v.                          :
                                     :
UNITED STATES,                       :
                                     :
         Defendant.                  :
_____:

[Plaintiff's motion for summary judgement is denied; defendant's cross-motion for summary judgment is granted.]

September 1, 2005

Neville Peterson LLP (Michael K. Tomenga, Lawrence J. Bogard, George W. Thompson, and Laura Martino) for Simon Marketing, Inc. and Perseco System Services, L.P., plaintiffs.

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney-in-Charge; International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mikki Graves Walser); of counsel: Michael W. Heydrich, Office of the Assistant Chief Counsel for International Trade Litigation, Bureau of Customs and Border Protection, for United States, defendant.

**OPINION**

**TSOUCALAS, Senior Judge:** Before the Court is a motion and cross-motion for summary judgment pursuant to USCIT R. 56 arguing there are no genuine issues as to any material facts. Plaintiffs, Simon Marketing, Inc. and Perseco System Services, L.P. ("Simon") challenge the classification of its merchandise under the 1998 Harmonized Tariff Schedule of the United States ("HTSUS") by the

Bureau of Customs and Border Protection[1] ("Customs"). Simon contends that the merchandise is properly classified as "other toys" under HTSUS subheading 9503.90.00, which is duty free. Customs cross-moves for summary judgment stating that the Court should sustain its classification under HTSUS subheading 9102.91.20 as a "watch," with a duty rate of 3.9 percent ad valorem on the movement and case and 5.3 percent ad valorem on the battery.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a) (2000).

## STANDARD OF REVIEW

On a motion for summary judgment, the Court must determine whether there are any genuine issues of fact that are material to the resolution of the action. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine if it might affect the outcome of the suit under the governing law. See id. Accordingly, the Court may not decide or try factual issues upon a

---

[1] The United States Customs Service was renamed the Bureau of Customs and Border Protection of the Department of Homeland Security, effective March 1, 2003. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135 (2002); Reorganization Plan for the Department of Homeland Security, H.R. Doc. No. 108-32 (2003).

motion for summary judgment. See Phone-Mate, Inc. v. United States, 12 CIT 575, 577, 690 F. Supp. 1048, 1050 (1988). When genuine issues of material fact are not in dispute, summary judgment is appropriate if a moving party is entitled to judgment as a matter of law. See USCIT R. 56; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

**DISCUSSION**

**I. Factual Background**

This dispute is ripe for summary judgment and the relevant facts are outlined below. Simon entered the merchandise subject to this action in October 1998. See Mem. P. & A. Supp. Pls.' R. 56. Mot. Summ. J. ("Simon's Mem.") at 2; Def.'s Mem. Opp'n Pls.' Mot. Summ. J. Supp. Def.'s Cross-Mot. Summ. J. ("Customs' Mem.") at 2. The subject merchandise is one of three promotional articles known as the "Pop Topper," which was sold at McDonald's in conjunction with the release of the movie "A Bug's Life."[2] See Customs' Mem. at 2; Pls.' Am. Statement Material Facts Not Dispute ("Simon's Facts") ¶¶ 11 & 15. The Pop Topper was sold separately from the Happy Meals program and could be purchased for $1.99. See Simon's Facts ¶ 15. The Pop Topper measures two and a half inches by two

---

[2]     Both parties acknowledge that only the "Pop Topper" is subject to this action and that the three articles together comprised the "Clip-Tock Watch Collection" promotion. See Customs' Mem. at 2; Simon's Facts ¶ 11.

and a fourth inches and is shaped to represent an old-fashioned soda bottle cap. See Simon's Facts ¶ 13; Customs' Mem. at 2-3. A dark red cap is latched and hinged to an inner green main body piece, which fits securely under the cap. See Simon's Facts ¶ 13; Customs' Mem. at 2-3. The inside face of the green body piece depicts two one-dimensional characters thematically tied to "A Bug's Life" around a quarter-inch by half-inch opto-electronic digital display that tells the date or the time. See Simon's Facts ¶ 13; Customs' Mem. at 2-3. The Pop Topper also has a split ring and chain allowing it to be attached to other articles, such as backpacks or belt loops. See Simon's Mem. at 5; Customs' Mem. at 2-3.

Customs classified the merchandise under HTSUS subheading 9102.91.20, as "other watches, electronically operated, with opto-electronic display only" with a duty rate of 3.9 percent ad valorem on the watch and 5.3 percent ad valorem on the battery. See Customs' Mem. at 3-4. On November 3, 1998, Customs issued Headquarters Ruling Letter NY D84205 ("NY D84205") holding that the subject merchandise was classifiable under subheading 9102.91.20. See Customs' Mem. Ex. B. In reaching its decision, Customs stated that while the watch case is "thematically tied to a movie and could be said to have a toy-like motif, the items themselves do not evoke the same response as a toy." Id. Customs further stated

that "[w]ithin the watch industry, humorous motifs are a common occurrence."  Id.

Simon filed a timely protest and application for further review challenging Customs' classification and sought reliquidation of the merchandise under subheading 9503.90.00 as "other toys." See Compl. ¶ 25; see also Headquarters Ruling Letter 963793 ("HQ 963793") (May 18, 2000) at Customs' Mem. Ex. C.  Both Simon's protest and application for further review were denied because Simon incorrectly completed the protest form indicating that it had not received an adverse administration decision from Customs when in fact NY D84205 had already been issued.  See Customs' Mem. Ex. C.  Simon then commenced this action on January 31, 2002.  See Compl.  Parties then filed their respective motions for summary judgment.  On May 20, 2005, the Court heard oral arguments from the parties.

The HTSUS sections relevant to the Court's discussion are set forth below:

| 9101 | Wrist watches, pocket watches and other watches, including stop watches with case of precious metal or of metal clad with precious metal |
|---|---|

. . .

| 9102 | Wrist watches, pocket watches and other watches, including stop watches, other than those of heading 9101: |
|---|---|

. . .

            Other:

    9102.91        Electronically operated:

    9102.91.20             With opto-electronic display only . . .
                           3.9% on the movement and case + 5.3% on
                           the battery

    9503       Other toys; reduced-size ("scale") models and
               similar recreational models, working or not;
               puzzles of all kinds; parts and accessories
               thereof:

    . . .

    9503.90.00    Other . . . Free


## II.  Contentions of the Parties

### A.    Simon's Contentions

Simon argues that Customs wrongly liquidated the Pop Topper as "other watches" under HTSUS subheading 9102.91.20 rather than its appropriate classification as "other toys" under subheading 9503.90.00. See Simon's Mem. at 6.  Simon contends that based on Rule 1 of the General Rules of Interpretation ("GRI"), the Additional United States Rules of Interpretation ("ARI"), and the Harmonized Commodity Description and Coding System, Explanatory Notes, (2nd ed. 1996) ("Explanatory Notes"), the Pop Topper should be classified under heading 9503 because it was designed specifically for amusement and therefore within the common meaning of term "toys."  See id. at 6-19.  Simon argues that the Pop Topper's principal use is that of amusement rather than utility. See id. at 10 & 12-17; Pls.' Mem. P. & A. Opp'n Def.'s Cross-Mot.

Summ. J. Reply Def.'s Opp'n Pl.'s Mot. Summ. J. ("Simon's Reply") at 9. Thus, the Pop Topper should have been classified as a "toy" even though it has the capacity to measure time. See Simon's Mem. at 12-17. Simon emphasizes the effort spent in producing the amusement value of the Pop Topper because it "stimulate[s] the imagination and [has] manipulation features that entice children into active play." Simon's Mem at 13. Simon notes that the battery is permanently sealed inside the Pop Topper, thereby limiting its ability to function as a watch for a finite period of time. See Simon's Mem. at 13-14; Simon's Reply at 9-13. Moreover, the cost of a replacement battery is more than the price of the article indicating that "the timekeeping function was unimportant." See Simon's Mem. at 14; see also Simon's Reply at 25-26 ("[I]t is not economically practical to use the Pop Topper as a watch beyond the relatively short life span of its battery."). Since the Pop Topper's utilitarian value is incidental to its amusement value, it should have been classified under heading 9503. See Simon's Mem. at 12-14.

Relying on the Explanatory Notes to Chapters 91 and 95 of the HTSUS, Simon argues that the Pop Topper falls within the type of articles considered "toy watches" under heading 9503. See id. at 17-19. Simon asserts that the Explanatory Notes to Chapter 91 exclude watches without movement but do not "exhaust the universe

of excludable toy watches." Id. at 18. Therefore, an article capable of measuring time but designed principally for another purpose is excluded from classification under Chapter 91. See Simon's Reply at 5. Since the Pop Topper was designed mainly for amusement and not utility, it is a type of "toy watch" supported by the Explanatory Notes for classification under Chapter 95. See id. at 5-6.

Simon argues, in the alternative, that if the Pop Topper is prima facie classifiable under both headings 9503 and 9102, then GRI 3[3] requires classification under heading 9503 as the most specific provision. See Simon's Mem. at 21-28. Finally, Simon asserts that Customs ruling NY D84205 warrants no deference by the Court. See id. at 29-30. NY D84205 warrants no deference because it was not adopted after a public notice and comment period and is inconsistent with Customs' previous classifications of similar articles. See id.

**B. Customs' Contentions**

Customs replies that its classification decisions, NY D84205, and HQ 963793, are entitled to respect pursuant to Skidmore v.

---

[3] GRI 3 states that "When, by application of rule 2(b) or for any other reason, goods are, prima facie, classifiable under two or more headings, classification shall be effected as follows: (a) The heading which provides the most specific description shall be preferred to headings providing a more general description . . . ."

Swift & Co., 323 U.S. 134 (1944). See Customs' Mem. at 6-10. Moreover, Customs asserts that its classification of the Pop Topper is consistent with its prior treatment of similar merchandise. See id. Customs argues that based on GRI 1, ARI 1 and the Explanatory Notes, the Pop Topper is prima facie classifiable under heading 9102 because it falls within the meaning and scope of the term "watch" and not "toy." See id. at 12-25. Customs concludes that because the Pop Topper is a battery powered, clip-on watch with an opto-electronic display designed to tell time, it "is a watch within the statutory meaning of that term and within the ordinary and common meaning of" the term "watch" as it is used in the United States. Id. at 13-14. Thus, the Pop Topper is appropriately classified under subheading 9102.91.20 because it is a fully functioning digital watch. See id. Customs further states that Simon's assertion that the Pop Topper is classifiable under heading 9503 is wrong. See Customs' Mem. at 15. Heading 9503 has been found to be a principle use provision by the court, thus governed by ARI 1(a). See id. at 16. Customs argues that the Pop Topper is principally used as a watch and not a toy because it was designed, marketed, and sold as a watch. See id. at 18. Simon made specific decisions during the design and advertising process, such as choosing a digital over analog timepiece and designating the Pop Topper as a part of the "Clip-Tock Watch Collection." See id. at 18-19.

Customs also refutes Simon's contention that the Explanatory Notes to Chapters 91 and 95 support classifying the Pop Topper as a toy. See Customs' Mem. at 25-26. Specifically, the Explanatory Notes to Chapter 91 exclude toy watches, "such as those without clock or watch movements (heading 95.03 or 95.05)." Id. at 25. Customs argues that the "toy watches" excluded from Chapter 91 are articles without watch movements, meaning they do not tell time but merely look like watches. See id. Since the watch aspect of the Pop Topper has watch movement rather than merely being the semblance of a watch, it is properly classified under heading 9102. See id. at 25-26.

Finally, Customs argues that even if the Pop Topper was prima facie classifiable under both headings 9102 and 9503, Customs' classification is still correct pursuant to GRI 3(a). See id. at 27-29. Customs argues that the term "watches" is a more specific description of the Pop Topper than the term "toys" because the latter term can encompass "potentially [ ] anything for the amusement of children or adults." Id. at 28. Customs also states that the Pop Topper is neither a "mixture, composite good, made up of different components, nor a good put up in sets for retail sale." Id. at 29. Accordingly, classification pursuant to GRI 3(b) is unnecessary. See id.

## III. Analysis

### A.    Motion for Summary Judgment

Determining whether imported merchandise was classified under the appropriate tariff provision entails a two-step process.  See Sabritas, S.A. de C.V. v. United States, 22 CIT 59, 61, 998 F. Supp. 1123, 1126 (1998).  First, the proper meaning of specific terms in the tariff provision must be ascertained.  Second, whether the imported merchandise falls within the scope of such term, as properly construed, must be determined.  See Sports Graphics, Inc. v. United States, 24 F.3d 1390, 1391 (Fed. Cir. 1994).  The first step is a question of law and the second is a question of fact. See id.; see also Universal Elecs., Inc. v. United States, 112 F.3d 488, 491 (Fed. Cir. 1997).  Pursuant to 28 U.S.C. § 2639(a)(1) (1994), Customs' classification is presumed correct and the party challenging the classification bears the burden of proving otherwise.  See Universal Elecs., 112 F.3d at 491.  This presumption, however, applies only to Customs' factual findings, such as whether the subject merchandise falls within the scope of the tariff provision, and not to questions of law, such as Customs' interpretation of a particular tariff provision.  See Sabritas, 22 CIT at 61, 998 F. Supp. at 1126; see also Universal Elecs., 112 F.3d at 491; Goodman Mfg., L.P. v. United States, 69 F.3d 505, 508 (Fed. Cir. 1995).  When there are no material issues of fact in dispute, as is admitted by both parties in the present case, the

statutory presumption of correctness is irrelevant.  Goodman Mfg.,
69 F.3d at 508.

The ultimate question in every tariff classification is one of
law; "whether the merchandise is properly classified under one or
another classification heading."  Bausch & Lomb, Inc. v. United
States, 148 F.3d 1363, 1365 (Fed. Cir. 1998).  Where, as in the
instant case, there is no disputed material issue of facts to be
resolved by trial, disposition by summary judgment is appropriate.
Pursuant to 28 U.S.C. § 2640(a) (1994), Customs' classification
decisions are subject to de novo review based upon the record
before the Court.  Accordingly, the Court must determine "whether
the government's classification is correct, both independently and
in comparison with the importer's alternative."  Jarvis Clark Co.
v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984).

### B.  Skidmore Respect

As a preliminary matter, the Court finds that Customs'
decisions in NY D84205 and HQ 963793 are not entitled to Skidmore
respect.  In Skidmore, 323 U.S. at 140, the Supreme Court set forth
the factors a reviewing court is to consider in determining how
much weight an agency's decision is to be afforded.  The amount of
respect an agency's decision is afforded by a court "will depend
upon the thoroughness evident in its consideration, the validity of
its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it the power to persuade, if lacking power to control." Id. The power to persuade of each Customs' classification ruling may vary depending on the Skidmore factors articulated in United States v. Mead, 533 U.S. 218 (2001). See Structural Indus., Inc. v. United States, 356 F.3d 1366, 1370 (Fed. Cir. 2004). The Court recognizes that Customs classification rulings are entitled to "a respect proportional to [their] 'power to persuade'," Mead, 533 U.S. at 235 (quoting Skidmore, 323 U.S. at 140), but the Court has an "independent responsibility to decide the legal issue regarding the proper meaning and scope of the HTSUS terms." Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed. Cir. 2002) (citing Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1358 (Fed Cir. 2001)).

NY D84205 merely states as its reasoning that "[a]lthough the cases for the watches are thematically tied to a movie and could be said to have a toy-like motif, the items themselves do not evoke the same response as a toy. Within the watch industry, humorous motifs are a common occurrence." Customs' Mem. Ex. B. The Court finds that Customs' explanation is cursory and without meaningful explanation. Therefore, NY D84205 is not entitled to Skidmmore respect. Similarly, HQ 963793 is also not entitled to Skidmore respect. Customs' reasoning for denying Simon's request for

further review was based upon the fact that Simon had checked a "no" box in answer to the question of whether an adverse administrative decision regarding the subject merchandise existed. See Customs' Mem. Ex. C. Customs' denial of Simon's request was not a substantive examination of the issues and therefore is not persuasive regarding the issue presently before the Court. Both of Customs' classification ruling letters failed to exhibit a thorough and valid reasoning giving them the "power to persuade". See Mead, 533 U.S. at 235 (quoting Skidmore, 323 U.S. at 140).

### C. Classification Under GRI 1

The proper classification of merchandise entering the United States is directed by the GRIs and the ARIs of the HTSUS. See Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The Court begins its analysis with GRI 1. See N. Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001). GRI 1 states that "classification shall be determined according to the terms of the headings and any relative section or chapter notes . . . ." GRI 1; see also Sabritas, 22 CIT at 62, 998 F. Supp. at 1126-27 (noting that the definition and scope of the terms of a particular provision is to be determined by the wording of the statute and any relevant section or chapter notes). Only after comparing headings, if a question persists, may the Court look to the subheadings for the correct classification. See

Orlando Food, 140 F.3d at 1440.  If the proper classification cannot be determined by reference to GRI 1, then it becomes necessary to refer to the succeeding GRIs in numerical order.  See N. Am. Processing, 236 F.3d at 698.  Additionally, the Explanatory Notes are not legally binding on the United States, yet they "generally indicate the 'proper interpretation' of provisions within the HTSUS . . . [and] are persuasive authority for the Court when they specifically include or exclude an item from a tariff heading."  Sabritas, 22 CIT at 62, 998 F. Supp at 1127; see also Mita Copystar Am. v. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994).

Both Simon and Customs argue that the Pop Topper is prima facie classifiable under GRI 1.  See Simon's Mem. at 8; Customs' Mem. at 12.  The dispute essentially lies with whether the utilitarian aspect of the Pop Topper, i.e. the watch, is incidental to its amusement value or whether its amusement value is incidental to its utilitarian purpose.  Simon argues that the Pop Topper is classifiable as a toy under heading 9503 because it was designed for and used principally for amusement and thus within the common meaning of "other toys."  See Simon's Mem. at 9-12.  Simon asserts that the Pop Topper's ability to tell time is merely incidental to its amusement value.  See id. at 12.  Customs, however, maintains that the Pop Topper is a watch under heading 9102 because it falls

within the meaning and scope of the term "watch." See Customs'
Mem. at 11-25. Customs further argues that the Pop Topper falls
within the "class or kind" of articles known as watches because it
was designed, marketed, and sold as a watch. See id. at 18-25.
For the reasons set forth below, the Court finds that the Pop
Topper is principally used as a watch and any amusement derived
from it is incidental.

The Pop Topper is a fully functioning digital watch designed
to simulate a bottle cap with an inside graphical face. It is well
settled that "when amusement and utility become locked in
controversy, the question becomes one of determining whether the
amusement is incidental to the utilitarian purpose, or the
utilitarian purpose is incidental to amusement."[4] Ero Indus., Inc.
v. United States, 24 CIT 1175, 1181, 118 F. Supp. 2d 1356, 1361
(2000) (citations omitted). In classification cases "the

---

[4] Parties cite a long string of cases where the Court has examined the utility versus amusement use of an article only to show that the analysis is often fact-specific to the particular article in question. See e.g., Ero Indus., 24 CIT 1175, 118 F. Supp. 2d 1356 (holding that amusement value of a tent was the primary use of the article); Minnetonka Brands, Inc. v. United States, 24 CIT 645, 110 F. Supp. 2d 1020 (2000) (holding that bubble bath containers were "toys" rather than "plastic bottles"); W. Stamping Corp. v. United States, 61 Cust. Ct. 152, 289 F. Supp. 1016 (1968) aff'd 57 C.C.P.A. 6, 417 F.2d 316 (1969) (holding that cheaply constructed typewriters had utility as "typewriters" rather than "toys"); N.Y. Merch. Co., Inc. v. United States, 62 Cust. Ct. 38, 294 F. Supp. 971 (1969) (holding that vinyl baseball gloves were "baseball equipment" rather than "toys").

merchandise itself is often a potent witness." Simod Am. Corp. v. United States, 872 F.2d 1572, 1578 (Fed. Cir. 1989) (citations omitted). For the Pop Topper to be appropriately classified as a toy, its principal and not incidental use must be that of amusement. While the Pop Topper has eye-catching caricatures and minimal manipulability, the Court finds that it is not principally used for amusement. Rather, based on its shape, design, and minimal interactive value, the Pop Topper is an article that closely resembles a pocket watch that can tell time. See Simon's samples.[5] Without the watch aspect, the Pop Topper would be a plastic article with two one-dimensional inanimate characters from "A Bug's Life" printed on it. Simon has failed to meet its burden of showing that such an article would be principally used for amusement purposes. Thus, the Pop Topper was properly classified under heading 9102.

The Explanatory Notes to the HTSUS also indicate that the Pop Topper was properly classified under heading 9102 rather than heading 9503. The Explanatory Notes to Chapter 91 state that "this Chapter excludes . . . c) toy clocks and watches . . . such as those without clock or watch movements[6] (heading 95.03 or 95.05)."

---

[5] Simon submitted a Pop Topper sample to the Court as part of its submissions ("Simon's samples").

[6] Watch movements is defined as "devices regulated by a balance-wheel and hairspring, quartz crystal or any other system

Explanatory Notes, 91 at 1663 (emphasis retained). The Explanatory Notes to heading 95.03 states that "[m]any of the toys of this heading are mechanically or electrically operated [including] . . . (16) Toy clocks and watches." Explanatory Notes, 95 at 1712. Simon argues that when the Explanatory Notes to Chapters 91 and 95 are read together, the Pop Topper is encompassed in heading 9503 and excluded from heading 9102. The "such as" language in the Explanatory Notes to Chapter 91 "requires that all 'toy watches' be excluded from Chapter 91 regardless of whether they possess watch movement." See Simon's Reply at 7. Customs argues, however, that when the two Explanatory Notes are read together, the types of "toy watches" excluded from heading 9102 are those articles that do not have watch movements. See Customs' Mem. at 25-26. The Court finds that Customs properly read these Explanatory Notes together.

"Toy watches" are articles that resemble watches and can be manipulated to exhibit time, but do not keep or tell time on their own. Simon argues that the Explanatory Notes to Chapter 91 "make clear that not all devices capable of measuring time are to be classified under Chapter 91." Simon's Reply at 6. Simon argues that the list of exclusions to Chapter 91 encompasses toy clocks

_____

capable of determining intervals of time, with a display or a system to which a mechanical display can be incorporated." Explanatory Notes, 91 at 1663. The fact that the Pop Topper has watch movement is not disputed by the parties. See Simon's Mem. at 5; Customs' Mem. at 3.

such as those without clock or watch movements.  See id. at 6-7.

Simon asserts that because the list of exclusions is not

exhaustive, then articles with clock and watch movements may be

excluded from classification under Chapter 91.  See id.  While

Simon is correct that the exclusions named in the Explanatory Notes

to Chapter 91 is not an exhaustive list, the article at issue must

fall within the scope of the demonstrative examples presented.  The

exclusions listed may apply to merchandise with watch movements

where the watch component is entirely incidental to its principal

use.  The Pop Topper's principal use, however, is that of a watch.

The Court holds that the Pop Topper is not the type of merchandise

encompassed by the term "toy watch" in the Explanatory Notes to

Chapters 91 and 95.  Consequently, the Pop Topper may not be

excluded from classification under Chapter 91.

Although the Pop Topper is not a "toy watch" under Chapters 91

and 95, the issue remains whether it has sufficient amusement value

to be correctly classified as "other toys" under heading 9503.

Heading 9503 is a "principle use" provision and thus governed by

ARI 1(a).  See Minnetonka, 24 CIT at 651, 110 F. Supp. 2d at 1026.

ARI 1(a) states that

> A tariff classification controlled by use (other than
> actual use) is to be determined in accordance with the
> use in the United States at, or immediately prior to, the
> date of importation, of goods of that class of kind to
> which the imported goods belong, and the controlling use
> is the principal use.

(emphasis added). "Principle use" is defined as the use "which exceeds any other single use of the article." Minnetonka, 24 CIT at 651, 110 F. Supp. 2d at 1027 (citations omitted). Further, it is the ordinary use of the "class or kind" of merchandise to which the subject merchandise belongs "even though particular imported goods may be put to some atypical use." Primal Lite, Inc. v. United States, 182 F.3d 1362, 1364 (Fed. Cir. 1999). The "class or kind" of articles considered "toys" under heading 9503 are articles whose principle use is "amusement, diversion or play, rather than practicality." Minnetonka, 24 CIT at 651, 110 F. Supp. 2d at 1027. The court has adopted certain factors to determine whether an article falls within a particular "class or kind" of merchandise ("Carborundum factors"). See United States v. Carborundum Co., 63 C.C.P.A. 98, 536 F.2d 373 (1976). The Carborundum factors include: (1) the general physical characteristics of the merchandise; (2) the expectation of the ultimate purchasers; (3) the channels, class, or kind of trade in which the merchandise moves; (4) the environment of sale; (5) usage, if any, in the same manner as merchandise which defines the class; (6) the economic practicality of so using the import; and (7) the recognition in the trade of the use. See Minnetonka, 24 CIT at 651-52, 110 F. Supp. 2d at 1027. Here, the Pop Topper must belong to the "class or kind" of merchandise whose principle use is "amusement, diversion or play, rather than practicality" to be classified as a "toy." See

Minnetonka, 24 CIT at 651, 110 F. Supp. 2d at 1026.

Simon bears the burden of proving classification under heading 9503.  See Universal Elecs., 112 F.3d at 491.  Simon argues that the Pop Topper is designed and mainly used for amusement, see Simon's Mem. at 12-17, but provides no compelling evidence to substantiate its claim.  Rather, by Simon's own admission, heading 9102 covers watches designed principally to measure time, while heading 9503 covers toys and toy watches "principally used for amusement, even if capable of measuring time."  See Simon's Reply at 3 (emphasis added).  While the Pop Topper may provide some amusement value, it is not inherent that the article is principally used as a toy.  Also, the fact that the Pop Topper was designed for children does not resolve whether it is principally used as a toy or a watch.

When examining the Pop Topper under the Carborundum factors, the Court finds that it is not an article of the "class or kind" of merchandise whose principle use is amusement, diversion or play.  The Pop Topper has the general physical characteristics of a clip-on pocket watch with an opto-electronic digital display capable of telling the date and the time.  While the graphics printed on the inside face of the Pop Topper serve to enhance and promote a user's imagination, the practical usage of the article as a time telling device cannot be dismissed.  The size and colorful nature of the

article merely indicates that the Pop Topper was designed for children. Any amusement value derived from the Pop Topper, however, is minimal and limited to the fixed one-dimensional graphics, which themselves do not move or cannot be manipulated in any way. The watch aspect of the Pop Topper is its dominant feature and exceeds any other use of the article. See Minnetonka, 24 CIT at 651, 110 F. Supp. 2d at 1027. The Pop Topper was also marketed and advertised as a watch. See Simon's samples; Simon's Mem. Ex. 2. The box the Pop Topper comes in is labeled "Clip-Tock Watch Collection." See Simon's samples (emphasis added). Included inside the packaging is a separate printed insert with instructions on how to set and switch the time and date on the display. See id. Furthermore, Simon intended the Pop Topper to be a watch because it chose to design and advertise the Pop Topper as a watch. See Simon's samples; Simon's Mem. Ex. 2, 4, 5. The Court notes that subject merchandise was not a part of the "Clip-Tock Toy Watch Collection" or "Clip-Tock Toy Collection." In fact, Simon did not refer to the Pop Topper as a "toy" anywhere on the packaging or in its marketing research materials. See Simon's samples; Simon's Mem. Ex. 2. The reasonable expectations of the purchasers were to receive a watch.

The Pop Topper was a promotional article for the movie "A Bug's Life," which could only be purchased at McDonald's, and was

sold separately from the Happy Meals[7] program. While the Pop Topper was $1.99, consumers considered the price a good value and were purchasing a watch because of an attachment to the promoted movie. See Simon's Mem. Ex. 5. Simon's own marketing research shows that the price was not unreasonably low for a watch and followed consumer expectations. See id. Simon's contention that replacing the battery is not economically practical is also unpersuasive because the value to a single consumer cannot be contemplated. Thus, any amusement value derived from the Pop Topper is incidental to its utilitarian aspect. The Pop Topper is of the "class or kind" of articles considered "watches" and not "toys" because its principal use is to tell time. To classify every eye-catching, child-friendly article as a toy, simply because it enhances a child's imagination, is to unacceptably blur the HTSUS headings defeating their purpose and leading to absurd results. Since the Pop Topper is prima facie classifiable under heading 9102 pursuant to GRI 1, examination under the remaining GRIs is unnecessary.

---

[7] The Happy Meals program is McDonald's traditional disbursement of toys and could arguably be a channel of trade for toys. See Simon's Mem. at 5-6.

**CONCLUSION**

The Court finds that Customs' decisions in NY D84205 and HQ 963793 are not entitled to <u>Skidmore</u> respect.  The Court also holds that based on its shape, design, and minimal interactive value, the Pop Topper is principally used as a watch and any amusement derived therefrom is incidental to its utilitarian aspect.  Accordingly, Customs properly classified the Pop Topper under subheading 9102.91.20.  For the foregoing reasons, Simon's motion for summary judgment is denied and Customs' cross-motion for summary judgment is granted.  Judgment will be entered accordingly.


     <u>/s/ Nicholas Tsoucalas</u>
       NICHOLAS TSOUCALAS
        SENIOR JUDGE

Dated:    September 1, 2005
          New York, New York